AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED

SEP 24 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                               DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

One (1) Samsung Galaxy Grand Prime Plus Cellular Telephone, Model: SM-G532M, IMEI: 359048080983725, S/N: R58J53CFR8F

Case No. **19MJ4140**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

located in the     Southern     District of     California    , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 952, 960 and 963 | Importation of controlled substances and conspiracy |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jonathan Hutchinson, SA, Homeland Security Investigation
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/24/2019

*Judge's signature*

City and state: San Diego, CA       Hon. F.A. Gossett, U.S. Magistrate Judge
*Printed name and title*

## **ATTACHMENT A-1**
PROPERTY TO BE SEARCHED

The following property is to be searched:

> One (1) Samsung Galaxy Grand Prime Plus Cellular Telephone
> Model: SM-G532M
> IMEI: 359048080983725
> S/N: R58J53CFR8F
> ("**Target Device 1**");

**Target Device 1** is currently in the possession of the Department of Homeland Security at 9495 Customhouse Plaza, San Diego, California 92154.

## **ATTACHMENT B**
ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of March 10, 2019, to June 8, 2019:

a. tending to indicate efforts to import methamphetamine or some other federally controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.**

# AFFIDAVIT

I, Jonathan Hutchinson, Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), being duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports applications for warrants to search the following electronic devices, as further described in Attachments A-1 and A-2 (collectively, the "**Target Devices**"), and seize evidence of crimes, specifically, violations of Title 21, United States Code, Section(s) 952, 960, and 963, as more particularly described in Attachment B:

> One (1) Samsung Galaxy Grand Prime Plus Cellular Telephone
> Model: SM-G532M
> IMEI: 359048080983725
> S/N: R58J53CFR8F
> ("**Target Device 1**", as described in Attachment A-1)
>
> One (1) Tech Pad Cellular Telephone
> Model: M5
> IMEI: 356625091761514
> S/N: ZEM5G20180701064
> ("**Target Device 2**", as described in Attachment A-2)

This search supports an investigation of BRANDON MARK KEMMERER for the crimes mentioned above. A factual explanation supporting probable cause follows.

2. The **Target Devices** were seized on June 7, 2019, at the time of KEMMERER's arrest at the San Ysidro, California Port of Entry (POE), when methamphetamine was found concealed in the vehicle that he drove into the United States. The **Target Devices** have been securely stored since they were seized and are currently in the possession of the Department of Homeland Security (DHS) and are presently stored at 9495 Customhouse Plaza, San Diego, California 92154.

3. Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, I believe that there is probable cause to believe that a search of the **Target Devices,** as described in Attachments A-1 and A-2, will produce evidence of the aforementioned crimes, as described in Attachment B.

4. The information contained in this affidavit is based upon my experience and training, consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause. Dates and times are approximate.

## EXPERIENCE AND TRAINING

5. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am also a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants. I also am authorized to investigate violations of laws of the United States.

6. I am a Special Agent (SA) with Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been so employed since April 2017. My duties include, among others, investigating the trafficking of illicit controlled substances and the importation and distribution of illegal substances. Prior to my working at HSI, I was employed as a Special Agent with Department of Justice (DOJ), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for four years.

7. I am a graduate of the Federal Law Enforcement Training Center at Glynco, Georgia where I have received training in investigating various narcotics-related offenses,

including the importation of narcotics and narcotics trafficking. I have had training in the methods used by controlled substance traffickers to import and distribute drugs and to operate detailed distribution networks. My training also has included the use of cellular and digital telephones and other electronic devices used by narcotics traffickers in the normal course of their illicit activities.

8. I have arrested or participated in the arrest of numerous persons for violations of the Controlled Substances Act. In these cases, I have conducted interviews with the arrested persons and their associates, as well as cooperating individuals and informants. I also have conducted surveillance of narcotics smugglers as they conduct their smuggling activity while crossing the border from Mexico into the United States and while operating inside the United States. Through these investigative activities, I have gained a working knowledge and insight into the typical activity of narcotics smugglers and the structure of their narcotics smuggling networks. I also have gained information as to the normal operational habits of persons who make their living as narcotics smugglers.

9. I have also spoken with other agents about their experiences and the results of their investigations and interviews. I have become knowledgeable of the methods and modes of narcotics operations, including the methods of operation typically used by narcotics traffickers. I have learned that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances.

10. Investigations of the smuggling and trafficking of narcotics generate many types of evidence including, but not limited to, cellular phone-related evidence such as voice and text messages referring to the arrangements of travel and payment, names, photographs, and phone numbers of co-conspirators. For example, based on my training and experience, I have learned that load drivers smuggling controlled substances across the border are often in telephonic contact with co-conspirators immediately prior to and following the crossing

of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substances.

11. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

   a. Drug traffickers and their accomplices often will use cellular/mobile telephones because they are mobile, and they have instant access to telephone calls, text, web, and voice messages.

   b. Drug traffickers and their accomplices often will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

   c. Drug traffickers and their accomplices often will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

   d. Drug traffickers often will use cellular/mobile telephones to communicate with drivers, including to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

   e. Drug traffickers often will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

   f. Drug traffickers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

   g. The use of cellular telephones by drug traffickers and their accomplices tends to generate evidence that is stored on the cellular telephones, including but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

12. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that

4

cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

    a. tending to indicate efforts to import methamphetamine or some other federally controlled substances from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

    d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e. tending to identify the user of, or persons with control over or access to, the target devices; and/or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

13. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for GSM cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal

security keys, contact lists and stored text messages. Some of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

14. Based upon my experience investigating drug smuggling, my training, and my consultation with other investigators who have experience investigating drug smuggling in near the border, I understand that drug smugglers will seek to smuggle drugs from Mexico to the United States by hiding the drugs in hidden compartments of cars, and in non-factory compartments (*i.e.*, compartments that the manufacturer did not design for ordinary use). Smugglers will then drive north from Mexico and seek to pass through POEs with the drugs undetected. (I am also aware that such individuals will sometimes try to generate a history of crossings to show that driving through a POE is ordinary behavior for them.) When they arrive in the United States, smugglers will take the drugs to a discreet location to transfer them to other people involved in the distribution chain, who can then send the drugs to other locations for downstream distribution.

15. Furthermore, based on my training and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that drug conspiracies often require detailed and intricate planning to successfully evade detection. Consequently, drug conspiracies often involve planning and coordination for several months—this planning often occurs through mobile telephones. Additionally, based on my training and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that coconspirators are often unaware when a fellow coconspirator has been arrested and will attempt to communicate with that coconspirator via mobile telephone after his or her arrest to determine the whereabouts of drugs that are being transported.

**FACTS SUPPORTING PROBABLE CAUSE**

16. According to a report by CBP Officer O. Perez, on June 7, 2019, at approximately 9:30 a.m., KEMMERER applied for admission into the United States

6

from Mexico at the San Ysidro POE as the sole occupant and driver of a Nissan Altima vehicle bearing California plates 8ETX534 (the "Vehicle"). Officer Perez's canine alerted to the rear driver side door. Officer Perez asked KEMMERER to put the car in "park" and turn it off. His canine then proceeded to the trunk of the Vehicle, and Officer Perez asked Defendant to open the trunk. His canine then alerted to the passenger side quarter panel. Officer Perez conducted a cursory inspection by lifting up the felt liner in the trunk near the quarter panel and observed packages there.

17. According to a report by CBP Officer J. Burnett, Officer Burnett was performing vehicle inspections at the San Ysidro POE and responded to Officer Perez's call for assistance. Officer Burnett observed cellophane-wrapped packages in the rear quarter panel on both sides of the trunk of the Vehicle. KEMMERER told Officer Burnett that the Vehicle was his and that he was going to San Diego. KEMMERER gave Officer Burnett two negative customs declarations. Officer Burnett removed KEMMERER from the Vehicle, handcuffed him, and escorted him into the security office. The Vehicle was then driven into the vehicle secondary lot for further inspection.

18. According to a report by CBP Officer A. Lopez, Officer Lopez was assigned as the primary operator of the Z-portal X-RAY machine at the San Ysidro POE on June 7, 2019. At approximately 9:41 p.m., he examined the Vehicle with the machine and noticed anomalies within the passenger door, both rear doors, spare tire, gas tank, and the windshield wiper reservoir area of the vehicle.

19. According to a report by CBP Officer D. Davis, at approximately 10:15 p.m., he was assigned to the vehicle secondary lot at the San Ysidro POE when he was assigned a seizure in relation to the Vehicle. He drove the vehicle to the seizure processing area and removed one package from the rear passenger side quarter panel, which he was informed tested positive for the characteristics of methamphetamine. Officer Davis subsequently proceeded to the security office and placed KEMMERER under arrest.

20. In total, 100 cellophane-wrapped packages weighing approximately 47.92 kg (105.65 lbs) were removed from various hidden locations in the vehicle. The packages were marked with two different identifiers – either with a "P" or an "O." Officer Davis further seized the Vehicle, the packages of methamphetamine, and the **Target Devices**.[1] I was notified of the event and responded to the San Ysidro POE. Upon my arrival, I made contact with KEMMERER and was provided with personal effects that had been seized from him. Among those personal effects were the **Target Devices**.

21. I advised KEMMERER of his *Miranda* rights. KEMMERER waived his rights, and I subsequently conducted a recorded interview of KEMMERER.

22. During the post-*Miranda* interview, KEMMERER denied knowledge of the controlled substances in the Vehicle and said the Vehicle had only been his for a very short time. KEMMERER stated that he registered the Vehicle in his name within the last few days, and that the car was his and no one else's. He stated that he purchased the car for $1000 less than one month prior from a neighbor, "Al," who lived a couple of doors away from him, and that he had a pink slip for the Vehicle. Later in the interview, KEMMERER stated that he actually had paid nothing for the Vehicle, but that it was worth $1000 and he was working toward paying Al for it. He stated that Al had asked KEMMERER to register the Vehicle in KEMMERER's name.

23. KEMMERER further stated that he had not had any mechanical work done on the Vehicle since he purchased it. He stated that he parked the Vehicle outside his residence and that both Al and Al's wife, "Susan," have the keys to the Vehicle. In particular, he stated that he had lent the Vehicle to Susan and that she had used the Vehicle a few times – as recently as two days prior, June 5, 2019. He further stated that

---

[1] It is unclear from Officer Davis' report whether the **Target Devices** were seized from the Vehicle or from KEMMERER's person. However, based on my training and experience, I know that CBP officers collect personal items from both the Vehicle and the individual's person, place them in a secure location, and if that person is subsequently arrested, provide them to the HSI case agent when he/she arrives at the POE.

8

he usually gives Al the keys to the Vehicle. KEMMERER initially stated that he was the primary driver of the Vehicle, but later indicated that using the Vehicle was a luxury, and that he typically asks Al if he can use the Vehicle for various purposes. He stated that when he crossed into the United States once or twice per week, he usually drove his father's truck, and that he had crossed into the United States in the Vehicle approximately three times. He stated that every previous time he crossed in the Vehicle, he was with Susan, and Susan drove.

24. KEMMERER stated he had asked Al to use the Vehicle that morning. He later said that Al had asked KEMMERER if he could cross the Vehicle that day. He stated that he had retrieved the keys to the Vehicle from Al at Al's residence that morning. He subsequently said that he met Al at a location, picked up the Vehicle, and then crossed into the United States. After that, KEMMERER clarified that that morning, he drove with Al in Al's vehicle to a location 10 minutes from the border to pick up the Vehicle, and that Al had given him the key to the Vehicle and **Target Device 2**.

25. KEMMERER also stated that he had called Al to tell him that the Vehicle smelled like gas, and that Al had asked him if the tank was full, to which KEMMERER replied that it was. KEMMERER stated that he thought maybe Al "may have had something to do with it. But [KEMMERER] had zero knowledge."

26. KEMMERER identified both **Target Devices** as his. He stated that **Target Device 1** was his "usual" phone, and that the day of his arrest was the first day that he had used **Target Device 2**. As noted above, KEMMERER stated that Al gave him **Target Device 2** that day.[2]

---

[2] Contents of **Target Device 1** were extracted at the POE using the Cellebrite application, and a report was generated. I reviewed the report. None of the information from that report is contained herein, and I ask the court not to rely on anything found or not found in that review in determining if there exists probable cause to search **Target Device 1**.

9

27. Given the facts surrounding KEMMERER's arrest, and based upon my experience and training, as well as consultation with other law enforcement officers experienced in drug smuggling investigations, I submit that there is probable cause to believe that KEMMERER used the **Target Devices** to further his drug smuggling activity, and that because the **Target Devices** have been securely stored since they were seized, information relevant to KEMMERER's drug smuggling activity continues to exist on the **Target Devices**. Such evidence could be in the form of communications, records, data (including but not limited to emails, text messages, other social messaging applications), photographs, audio files, videos, or location data.

28. I also know that drug trafficking conspiracies require intricate planning and coordination to successfully evade detection. Based upon my professional training and conversations with other law enforcement officers, this planning and coordination often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States. Additionally, co-conspirators are often unaware of a subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine the whereabouts of valuable cargo, particularly in the hours following the arrest. Therefore, I believe that the appropriate date range for the search of the **Target Devices** is from March 10, 2019, up to and including June 8, 2019, which was the day following KEMMERER's arrest.

## METHODOLOGY

29. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and/or serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device

over the internet and remotely destroy all the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

30. Following the issuance of this warrant, I will collect the subject cellular/mobile telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

31. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

## CONCLUSION

32. Based on all the facts and circumstances described above, there is probable cause to conclude that KEMMERER used the **Target Devices** to facilitate violations of Title 21, United States Code, Section(s) 952, 960, and 963.

33. Because the **Target Devices** were promptly seized during the investigation of KEMMERER's trafficking activities and have been securely stored, there is probable cause to believe that evidence of illegal activities committed by KEMMERER continues to exist on the **Target Devices**.

34. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the **Target Devices** described in Attachments A-1 and A-2, and seize the items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Jonathan Hutchinson
Special Agent
Homeland Security Investigations
Department of Homeland Security

Subscribed and sworn to before me this 24 day of September, 2019.

The Honorable F. A. Gossett
United States Magistrate Judge